IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

MATTHEW JAMES BURKE,           )
                               )
        Plaintiff,             )
                               )
                               )   CIV-14-1138-F
v.                             )
                               )
CAROLYN W. COLVIN,             )
  Acting Commissioner of Social)
  Security Administration,     )
                               )
        Defendant.             )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I. Procedural History and Medical Evidence

Plaintiff applied for benefits on September 16, 2010, and alleged that he was disabled beginning July 24, 2009. (TR 25). The agency determined that Plaintiff's insured status for the purpose of Title II benefits expired on December 31, 2010. Plaintiff alleged disability

1

due to Klinefelter syndrome, peripheral arterial occlusive disease, venous stasis ulcers, bipolar disorder type I, manic type with psychotic features, generalized anxiety disorder, major depressive disorder with suicidal and homicidal ideations, chronic low back pain, morbid obesity, hyperlipidemia, a breathing disorder, intermittent explosive disorder, and personality disorder. (TR 29).

Plaintiff stated that he had a high school education, previously worked as an over-the-road truck driver for several years, and he stopped working on May 30, 2007. (TR 141-42, 159-60). Plaintiff worked for a short period of time as a truck driver in 2012, but he did not return to this job after he was involved in a motor vehicle accident. (TR 230).

Plaintiff completed two written function reports dated August 19, 2011 (TR 162-169) and February 14, 2012 (TR 186-194). Plaintiff's father completed a third party function report in August 2011 (TR 170-177) and a second, undated third party function report (TR 203-210). Plaintiff's sister also completed a third party function report dated February 15, 2012. (TR 195-202).

An administrative hearing was conducted on January 3, 2013, before Administrative Law Judge Shepherd ("ALJ") at which Plaintiff and a vocational expert ("VE") testified. (TR 23-65). Plaintiff stated he was 45 years old, weighed 300 pounds, lived with his father in his father's house, used a cane as a walking aid and compression stockings for his peripheral vascular disease, completed high school in special education classes, previously worked as a truck driver, and had recently renewed his commercial driver's license. Plaintiff testified he had sharp, stabbing pain in his legs due to peripheral vascular disease and he occasionally

2

had open ulcers on his body. Plaintiff stated he also had back pain treated with pain medication, a breathing disorder treated with steroid inhalers, depression with feelings of worthlessness, a history of five suicide attempts, anger and homicidal ideations toward his father, and difficulty sleeping. Plaintiff estimated he could stand for 20 minutes. With respect to his daily activities, Plaintiff stated that he drove his father to doctors' appointments and to the grocery store and built model airplanes.

The record shows Plaintiff has been treated for ulcers on his right leg in 2003, his left foot in 2005, and on his left leg in 2010. (TR , 379-380, ). The ulcers are caused by chronic venous status related to Klinefelter syndrome.[1]  MRI testing of Plaintiff's cervical spine conducted in 2003 was interpreted as showing very minimal spondylosis with no significant stenosis. (TR 258). Plaintiff has been treated with narcotic and non-narcotic pain medications and muscle relaxant medications for back pain, although X-ray testing of Plaintiff's lumbar spine in 2009 was interpreted as showing no abnormalities. (TR 375, 377).

Plaintiff was treated on a monthly basis between October 2009 and May 2010 by Dr. Naidu for back pain and anxiety. (TR 301-317). Plaintiff reported in October 2009 that he was working as a window washer. (TR 316). A physical examination was noted to be normal except for elevated body mass index, paravertebral muscle spasm, and a rash on both

---

[1] "Lower extremity ulceration is a recognized complication of Klinefelter syndrome." www.ncbi.nih.gov/pmc/articles/PMC3664240/. Klinefelter syndrome is a genetic condition in which a male has an extra X chromosome, which can cause reductions in genital growth, testosterone production, muscle mass, and body/facial hair, and enlarged breast tissue. http://www.mayoclinic.org/diseases-conditions/Klinefelter-syndrome/basics/definition/con-20033637.

of Plaintiff's legs. He was prescribed pain and muscle relaxant medications for "backache" and anti-anxiety medication. (TR 318).

In November 2009, Plaintiff reported the medications were working to relieve his back and neck pain. (TR 314-315). In February 2010, Plaintiff again reported to Dr. Naidu that the pain medication was "work[ing] great." (TR 307). Dr. Naidu noted physical examinations of Plaintiff were normal in February and March 2010. (TR 305-309). Dr. Naidu prescribed anti-depressant medication for Plaintiff in February and March 2010. In May 2010, Dr. Naidu noted that although Plaintiff complained of neck, back, and leg pain and anxiety, he exhibited normal range of motion in his neck and back and normal mood, affect, and behavior. (TR 301-302). Dr. Naidu prescribed pain and anti-anxiety medications.

In June 2010, Plaintiff established care with Dr. Angela Morgan, who prescribed the same narcotic and non-narcotic pain medications previously prescribed by Dr. Naidu for leg, back, and neck pain. (TR 364). In July 2010, Plaintiff reported that the pain medication "helps," and Dr. Morgan refilled his pain medications and prescribed anti-anxiety medication. (TR 362). In August 2010, Dr. Morgan noted that Plaintiff had venous stasis ulcers on his leg. (TR 357). Plaintiff told Dr. Morgan that he was doing wound care at home.

In August 2010, Plaintiff sought treatment at OU Medical Center for left leg pain occurring for about six years that was aching and moderately severe. (TR 472). The examiner, Dr. Dellinger, noted Plaintiff had no difficulty walking and no motor or sensory deficits. (TR 472-473). The diagnostic impression was peripheral arterial occlusive disease in Plaintiff's left leg with claudication and ulceration. (TR 474). He was advised to continue

his pain and anti-anxiety medications.

In September 2010, Dr. Morgan refilled Plaintiff's pain medications, noted venous stasis ulcers were present on Plaintiff's leg, and increased the dosage of Plaintiff's anti-anxiety medication. (TR 347). Dr. Morgan also prescribed testosterone. (TR 330).

In November 2010, Dr. Morgan noted that Plaintiff was being treated for Klinefelter syndrome with testosterone, that he was "doing better" with his leg ulcers which were starting to heal. However, he was out of his pain medication although it was "a week early" for pain medication refills. (TR 336). Dr. Morgan noted "concerns about Plaintiff's addiction to diazepam." (TR 336). In December 2010, Dr. Morgan noted she had advised Plaintiff to find a pain management physician. (TR 334).

In January 2011, Dr. Morgan's office notes indicate that in a telephone call to the office Plaintiff stated "he is unstable [at] this time. Had to go to a detention center [two times.] [He] stated if he doesn't get his med. he is going postal." (TR 332). The notation states that Plaintiff was informed his treatment had been terminated at the direction of Dr. Morgan.

In September 2010, Plaintiff sought treatment from Dr. Gregory Morgan, a specialist OU Medical Center's hyperbaric/wound care clinic, for leg ulcers. (TR 426). Dr. Morgan noted that a physical examination of Plaintiff was normal. The doctor noted that Plaintiff appeared well nourished and overweight and exhibited a "bit low" intellectual level. (TR 426). Dr. Morgan also noted Plaintiff showed no evidence of depression, memory deficit, or anxiety. The diagnosis was left medial leg ulcers, Klinefelter syndrome, and venous

5

incompetence. (TR 428). Six days later, Dr. Morgan noted progress was being made in Plaintiff's treatment. (TR 429-430).

In January 2011, Dr. Morgan noted he had advised Plaintiff to do "3 things to prevent recurrence of venous leg ulcers," including walking, elevating his legs "as much as possible with feet higher than [his] heart," and wearing compression hose. In February 2011, Dr. Morgan's office advised Plaintiff's former primary care physician that Plaintiff's wounds were healed and that he had been discharged on January 27, 2011. (TR 417).

In September 2010, Plaintiff was transported to the Oklahoma County Crisis Intervention Center ("OCCIC") for treatment of depression. (TR 389). He stated his mother had died recently, he lived with his father, and he denied suicidal or homicidal ideations. (TR 389). However, the record shows Plaintiff was transported to OCCIC after he stated to treating providers at the OU Medical Center that he had suicidal and homicidal plans and access to guns. (TR 393). The diagnostic impression was major depressive disorder, recurrent, severe without psychotic features and cocaine dependence in remission. (TR 391). Plaintiff was discharged two days later with a prescription for anti-depressant medication. (TR 395).

In December 2010, Plaintiff was transported to a hospital emergency room after a law enforcement officer responded to a call from Plaintiff's and his father's residence about a "suicidal person." (TR 272). Plaintiff reported he was having homicidal thoughts toward his father and thoughts of suicide related to his mother's recent death and ongoing problems with chronic venous insufficiency in his left leg. (TR 263, 274). He also reported he was on

probation for felony drug possession/intent to distribute cocaine. (TR 283). Plaintiff was evaluated at the hospital and then transported to OCCIC on an emergency detention order. (TR 265).

In an evaluation at OCCIC Plaintiff denied suicidal or homicidal ideations. (TR 409). The interviewer noted that Plaintiff was "on high dose narcotics and [benzodiazepine medications] which have led him to be incredibly sedated but still very responsive and aware." (TR 409). The diagnostic impression was unspecified depressive disorder, unspecified anxiety disorder, and adjustment disorder with mixed anxiety and depressed mood. (TR 410). Plaintiff was discharged the same day after reporting he had "calmed down and [was] ready to go home." (TR 411).

On January 17, 2011, Plaintiff returned to Dr. Naidu for treatment and informed Dr. Naidu that he had severe pain in his back, neck, and leg beginning the week before and that he had "[b]een to ER about 11 times in the last three months." (TR 297, repeated 381). Plaintiff also advised the physician that he had recently been arrested in a "family dispute." (TR 297, repeated 381). Dr. Naidu noted that Plaintiff was morbidly obese and had peripheral vascular disease. In a physical examination, Dr. Naidu noted that Plaintiff exhibited a normal range of motion in his neck and back. In a mental status examination, Dr. Naidu noted Plaintiff had a normal mood and affect, normal behavior, and normal judgment and though content. (TR 298, repeated 382). Plaintiff was prescribed narcotic pain and muscle relaxant medications. (TR 298, repeated 382).

Plaintiff sought mental health treatment at North Rock on January 13, 2011. (TR 441-

7

467). In an intake assessment, Plaintiff stated he had learning disabilities, and he admitted he was noncompliant with his treating doctor's orders. Plaintiff also stated that he had completed the tenth grade and dropped out of high school, he lived with his father, he had no friends, he impulsively engaged in activities involving explosives and guns, he had difficulty with judgment, he built models and flew remote control airplanes, he was supported by his father and a trust, and he had no problems with self-care and did yard maintenance chores for his father. (TR 445-457).

Plaintiff was transported to OCCIC by a hospital security guard on January 20, 2011, after he complained at a hospital emergency room that his treating physician had terminated him, that he had chronic back and leg pain, and that he had been off of his pain medications for four days and was not sleeping. (TR 412-413). He asked for a referral to a methadone clinic. (TR 413). Plaintiff denied suicidal or homicidal ideations, and he was discharged. (TR 413-414).

Plaintiff underwent an initial psychiatric evaluation on January 21, 2011, conducted by Dr. Al-Botros at North Rock Medication Clinic. (TR 463). Dr. Al-Botros noted that Plaintiff's speech was tangential, he had difficulty sustaining concentration, he seemed manic, he exhibited some delusional thoughts about the CIA being after him, he was paranoid and irritated, and he had difficulty organizing his thoughts. (TR 464). Dr. Al-Botros noted Plaintiff "thinks he is dependent on pain medication." (TR 465). The diagnosis was bipolar I disorder, most recent episode manic with psychotic features, opiate-induced mood disorder, and opiate dependence. (TR 465). Mood-stabilizing and anti-depressant

medications were prescribed. (TR 465). In March 2011, Dr. Al-Botros noted Plaintiff was not compliant with the prescribed medications, and Plaintiff was discharged from the clinic for non-compliance in March 2011. (TR 469, 600).

In October 2012, Plaintiff returned to North Care, and an intake assessment was conducted. (TR 603-617). According to the interviewer's notes of the assessment, Plaintiff stated he had been arrested recently for making an explosive with the intent to blow up another person's property and he also had been taking Lortab® purchased on the street. (TR 605). Plaintiff was still living with his father, and he described chronic pain in his legs, back, and neck that was "intolerable on some days." (TR 605). The diagnostic impression was intermittent explosive disorder, paranoid disorder, and personality disorder. (TR 669).

II. ALJ's Decision

The ALJ issued a decision on February 22, 2013, in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 9-20). Following the agency's well-established sequential evaluation procedure, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity between the date he alleged his disability began, July 24, 2009, and the date his insured status expired, December 31, 2010. (TR 11).

At step two, the ALJ reviewed the medical evidence and found that Plaintiff had severe impairments due to peripheral vascular disease, recurrent skin ulcers, chronic venous stasis, Klinefelter syndrome, obesity, depression, and bipolar disorder. (TR 11-14) At step three, the ALJ found that Plaintiff's impairments were not *per se* disabling under the

9

agency's Listing of Impairments.

At the fourth step, the ALJ found that Plaintiff was capable of performing sedentary work[2] with sitting for about 6 hours in an 8-hour workday and standing and walking for at least 2 hours during the workday, occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling. (TR 15). The ALJ found that Plaintiff could not climb ladders, ropes, or scaffolds, and that he could understand, remember, and carry out simple, routine, and repetitive tasks and have only occasional contact with the general public. (TR 15). In connection with this RFC finding, the ALJ considered Plaintiff's testimony, the function reports completed by Plaintiff and his family members, and the opinions of Dr. Gregory Norman and the state agency medical consultants concerning Plaintiff's physical functional abilities. The ALJ found that Plaintiff's RFC for work precluded the performance of his previous job as a truck driver.

Relying on the VE's hearing testimony in which the VE identified jobs available for an individual with this RFC for work, the ALJ found at step five that Plaintiff was capable of performing jobs available in the economy, including the jobs of table worker, machine feeder, and wafer breaker. (TR 18-19). The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 404.981; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

---

[2]Sedentary jobs are defined as jobs involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. A sedentary job involves mostly sitting and may also involve occasional walking and standing in carrying out job responsibilities. 20 C.F.R. § 404.1567(a).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

IV. Evaluation of Medical Opinions

Plaintiff contends that the ALJ erred in evaluating the opinion of his treating

physician, Dr. Gregory Morgan, concerning his work-related functional abilities. The record includes a written Physical Medical Source Statement completed by Dr. Gregory Morgan on January 13, 2011. In this opinion, Dr. Morgan stated that Plaintiff was capable of sitting for 3 hours at one time and for 2 hours in an 8-hour workday, standing for 1 hour at a time and for 2 hours in an 8-hour workday, walking for 2 hours at a time and for 2 hours in an 8-hour workday. (TR 649). Dr. Morgan further opined that Plaintiff could occasionally lift or carry up to 10 pounds, occasionally bend, climb, or stoop, and never squat or crawl. (TR 649-650).

Dr. Morgan opined that Plaintiff had mild limitations in being around moving machinery, being exposed to marked changes in temperature and humidity, and being exposed to dust, fumes, and gasses. (TR 650). Dr. Morgan opined that Plaintiff was moderately limited in his ability to drive. (TR 650). Dr. Morgan further stated that Plaintiff would be absent from work about 10 days per month due to his impairments and subjective complaints and that he would have to lie down or recline due to his impairments and subjective complaints for a minimum of three hours a day. (TR 650). As support for these findings, Dr. Morgan noted Plaintiff had "chronic leg ulcers," "Klinefelter syndrome," "chronic wounds," and "venous stasis." (TR 649-650).

Generally, a treating physician's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *2). However, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." Pisciotta v. Astrue, 500 F.3d 1074, 1078

(10th Cir. 2007)(internal quotation marks omitted). When an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." Id. at 1077. "Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300).

The ALJ's decision reflects consideration of the medical source statement completed by Dr. Morgan. The ALJ explained that he gave the opinion "no weight" because the opinion was internally inconsistent concerning Plaintiff's functional abilities to sit at one time or over the course of an 8-hour workday and it was not supported by objective medical evidence concerning the lifting/carrying limitation described in the opinion.

The record shows that Dr. Morgan, a wound care specialist, treated Plaintiff in September and October of 2010 and January 2011 for ulcers on his left leg. (TR 416-440). Plaintiff's leg ulcers healed with treatment, and in January 2011 he was discharged from Dr. Morgan's care. (TR 421). In his January 2011 office note, Dr. Morgan indicated that he advised Plaintiff to "[e]levate [his] leg(s) above the level of the heart when sitting," to "[a]void prolonged standing in one place," and to "wear support hose daily" for compression/edema control. (TR 421). He also advised Plaintiff to "walk daily" and continued his current medications. Finally, he advised Plaintiff to "[d]o these 3 things to prevent recurrence of venous leg ulcers: 1. Walk[,] 2. Elevate legs as much as possible with

13

feet higher than heart[, and] 3. Wear compression hose 30-40 mm Hg." (TR 421). Another physician, Dr. Whitsett, who treated Plaintiff's lower extremity ulcers in November 2010 also instructed Plaintiff to keep his leg elevated, continue to treat his ulcers as instructed, and wear compression stockings. (TR 513).

Plaintiff contends that the ALJ erred in evaluating Dr. Morgan's medical opinion because the ALJ did not address the work-related limitation set forth in the opinion that Plaintiff would need to lie down or recline for three hours during the normal workday. While the ALJ did not explicitly consider Dr. Morgan's assessment concerning Plaintiff's need to lie down or recline, the ALJ addressed other restrictions included in the opinion and at least implicitly rejected this restriction by stating he had given the entire opinion "no weight." See Causey v. Barnhart, 109 Fed. App'x. 375, 377-78 (10th Cir. 2004)(unpublished op.)(where ALJ adopted all of the restrictions listed by plaintiff's treating physician except for plaintiff's need to lie down, ALJ implicitly found that doctor's opinion on plaintiff's need to lie down during the normal workday was not entitled to controlling weight).

Plaintiff contends that the record of Plaintiff's treatment by Dr. Morgan was consistent with his opinion regarding Plaintiff's need to lie down or recline during the workday because Dr. Morgan had instructed Plaintiff to elevate his legs higher than his heart as much as possible in order to prevent further leg ulcers. The ALJ did not explain why he rejected this limitation, even though it found support in the medical record. Moreover, Plaintiff's sister stated that Plaintiff could not walk, stand, or sit for long periods of time and must elevate his legs on a frequent basis. (TR 195).

In a social security determination, "the ALJ also must discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996)(citation omitted). The ALJ did not consider in his decision Plaintiff's RFC in light of his need to elevate his legs (which roughly corresponds with the need to lie down/recline given the doctor's instruction that the legs should be higher than the heart) or explain how the evidence undermined Plaintiff's sister's statement concerning his need to elevate his legs on a frequent basis. (TR 195).

The Commissioner points out that Dr. Morgan's opinion that Plaintiff needed to lie down or recline during the day was not consistent with his opinion concerning Plaintiff's ability to walk and stand. However, the ALJ made no such finding, and the Court should not consider this after-the fact rationalization. See Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004)("The ALJ's decision should have been evaluated based solely on the reasons stated in the decision.").

V. RFC for Work

Plaintiff makes a related argument that the ALJ's RFC finding is not supported by substantial evidence in the record based, *inter alia*, on the Medical Source Statement completed by Dr. Morgan. In light of the previous finding, there is probative evidence in the record that the ALJ did not expressly consider. Therefore, the Commissioner's decision should be reversed and remanded for further administrative proceedings.

15

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's application for benefits and REMANDING the case for further administrative proceedings. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____October 26th__, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this __5th__ day of ____October____, 2015.

*[signature]*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE